**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| IN THE MATTER OF THE SEARCHES OF: | |
|---|---|
| Small Blue Apple iPhone (TARGET TELEPHONE 1) | Magistrate No. 26-1007 |
| Large Blue Apple iPhone (TARGET TELEPHONE 2) | Magistrate No. 26-1008 |
| Black Apple iPhone (TARGET TELEPHONE 3) | Magistrate No. 26-1009 |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

I, Ryan P. O'Sullivan, being duly sworn, state as follows:

1.      I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Pittsburgh Field Office, Group II. I have been employed as an ATF Special Agent since September of 2015. While at the ATF National Academy, I received extensive training in investigating federal firearms, arson, explosives, and narcotics related violations, conducting surveillance, establishing probable cause, and executing search and arrest warrants.

2.      As an ATF Special Agent, I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3.      As an ATF Special Agent, I am responsible for enforcing Federal criminal statutes and am authorized to serve arrest and search warrants under the authority of the United States. I have participated in numerous federal and state search warrants related to firearms, arson,

explosives and narcotics violations, and I have assisted in the writing of affidavits to this effect.

4.      I have participated in criminal investigations with ATF as well as other federal, state and local law enforcement agencies relating to violations of various federal laws. I have been involved in firearms and narcotics-related arrests and the execution of search warrants and arrest warrants, which resulted in the seizure of firearms and narcotics and have assisted in the supervision of activities of confidential informants who provided information and assistance resulting in controlled purchases of firearms and narcotics.

5.      As an ATF Special Agent, I am familiar with the way in which individuals involved in illegal trafficking of firearms or and/or narcotics use cellular telephones, and that evidence can be obtained from the cellular telephones of individuals involved in that illegal activity.

6.      The information contained herein is based upon my own personal investigation, observations, and knowledge, as well as upon the investigation, personal observations, and knowledge of other law enforcement officers with whom I have discussed this case.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a search warrant, I have not included every item of evidence or piece of information known to me; rather, I have included only those facts necessary to establish probable cause. I have not, however, withheld or neglected to include any information known to me that would defeat or negate the probable cause set forth herein.

7.      For the reasons and to the extent detailed below, I am submitting this affidavit in support of search warrants for the following:

> a.      A small blue Apple iPhone seized from Brandon WARD, referred to herein as the "TARGET TELEPHONE 1", and further described in Attachment A-1;

b.      A large blue Apple iPhone seized from Brandon WARD, referred to herein as the "TARGET TELEPHONE 2", and further described in Attachment A-2;

c.      A black Apple iPhone seized from Brandon WARD, referred to herein as the "TARGET TELEPHONE 3", and further described in Attachment A-3;

8.      TARGET TELEPHONES 1 THROUGH 3 may be collectively referred to as the "SEARCH LOCATIONS" throughout this Affidavit.

9.      TARGET TELEPHONES 1 THROUGH 3 are currently in the custody of the Pittsburgh Bureau of Police (PBP) computer crimes unit.

10.     The purpose of these search warrants is to search TARGET TELEPHONES 1 THROUGH 3 for evidence of violations of Title 18, U.S.C. § 922(g)(1), herein referred to as the "TARGET OFFENSE", further described in Attachment B.

11.     As set forth below there is probable cause to believe that the VEHICLE and TARGET TELEPHONES 1 THROUGH 3, will contain evidence of the TARGET OFFENSES, as described in Attachment B.

## PROBABLE CAUSE

12.     On May 31, 2026, at approximately 1100 hours, Officer Louis Cuccaro of the Monroeville Police Department observed a Black BMW X6M with Ohio registration KUR7455 (the VEHICLE) traveling southbound on State Route 48 within Monroeville Borough, Allegheny County, Pennsylvania.

13. Officer Cuccaro observed the vehicle displaying extremely dark aftermarket side window tinting, preventing observation into the vehicle's interior, and an obscured registration plate that was unreadable, constituting Pennsylvania Vehicle Code violations.

14. Through his training, experience, and participation in highway interdiction and criminal investigations, Officer Cuccaro knows individuals involved in criminal activity commonly utilize excessive window tinting and obscured registration plates to conceal occupants, firearms, criminal associates, and to avoid law enforcement detection, witness identification, and automated license plate reader systems. Officer Cuccaro has been involved in other traffic stops and law enforcement interdiction activities where individuals who are involved in criminal activity have engaged in similar behavior, such as excessive window tint preventing observation of the internal compartments of the vehicle from the exterior, and using methods to obscure or obstruct their license plates from law enforcement and automated vehicle and traffic devices (e.g., automated license plate readers, toll enforcement readers, etc.).Specifically, Officer Cuccaro has been a police officer since November 2012 and has been employed by the Monroeville Police Department since December 2017. He has completed training sponsored by the Allegheny County District Attorney's Office, including DANET Basic Drug Investigator School. He has also completed Heroin Epidemic Investigative Techniques and Interviewing and Interrogation courses through the FBI, along with extensive highway interdiction training, including the Pennsylvania State Police five-day "Safe Highways Initiative through Effective Law Enforcement and Detection program (SHIELD) training, Smugglers Inc., Evading Honesty, Highway Interdiction through Sheriff Mike Lewis, Street Cop Deceptive Behaviors and Hidden Compartments, Street Cop Interdiction Mastermind, and similar drug interdiction trainings.

15.    Furthermore, Officer Cuccaro has experience involving narcotic investigations, including in narcotic investigations involving firearms and/or cellular telephones. He has participated in hundreds of criminal investigations involving firearms, narcotics, and violent crime offenses. He has also applied for, obtained, and executed search warrants and has seized firearms, firearm accessories, cellular telephones, and other evidence utilized in criminal activity. Through training, experience, and investigations, Officer Cuccaro is familiar with the manner in which individuals involved in criminal activity conceal, transport, possess, and store firearms, ammunition, firearm accessories, records of ownership, and electronic evidence. Likewise, he is familiar with how individuals engaged in drug-related criminal activities possess and use cellular telephones to further their illicit drug trafficking activities and operations, as well as conceal and obscure from law enforcement indicia of drug trafficking activities and operations. For instance, drug dealers and traffickers will often use their cellular telephones to arrange and manage purchases and sales of drugs, communicate with suppliers and purchases of drugs, document and their illicit products and inventory, and navigate to and from drug transactions.

16.    Based upon his observations, Officer Cuccaro initiated a traffic stop on the VEHICLE in front of 4221 Northern Pike, Monroeville, Pennsylvania.

17.    A CLEAN inquiry revealed the vehicle to be a Black BMW X6M bearing Ohio registration KUR7455, VIN# 5YMCY0C08P9R79703, registered to Brandon WARD. (CLEAN is the Commonwealth Law Enforcement Assistance Network and provides law enforcement officers and criminal justice agencies with access to various databases, such as driver license and motor vehicle information, state criminal history record information maintained in the Pennsylvania State Police Central Repository and Pennsylvania's central registry for Protection from Abuse orders, stolen and wanted files, *et cetera*.  CLEAN is Pennsylvania's conduit to the

National Criminal Information Center (NCIC), the FBI's National Crime Information Center, and to Nlets, the International Justice and Public Safety Information Sharing Network.)

18.     The VEHICLE was registered to, operated by, and/or used by Brandon WARD on May 31, 2026.

19.     Officer Cuccaro identified the driver of the VEHICLE as Brandon WARD and the passenger as Winner Clayton-Fields, both from Akron, Ohio.

20.     A records inquiry revealed WARD was operating under a suspended driver's license status.

21.     During the encounter, WARD and Clayton-Fields provided conflicting travel stories, and WARD appeared visibly nervous while attempting to explain his travel itinerary.

22.     WARD granted Officer Cuccaro with consent to search the vehicle.

23.     Prior to conducting the search, Officer Cuccaro asked Clayton-Fields whether she possessed any firearms, which she denied.

24.     During the consent search, Officer Cuccaro lifted the rear driver-side seat cushion, which Officer Cuccaro observed was unsecured and easily movable.

25.     Underneath the rear driver-side seat cushion, Officer Cuccaro located a concealed **Sig Sauer P320 handgun bearing serial number 58J164572**. An NCIC check found no ownership and no information that the firearm was reported stolen. An ATF Trace was requested by Monroeville Police Department Corporal Detective Matthew White.

26.     The firearm was loaded with a magazine containing fourteen (14) rounds of 9mm ammunition. No round was chambered.

27. The firearm was positioned underneath the rear driver-side seating area, with the barrel facing towards the passenger side and the grip facing towards the driver's side of the vehicle, consistent with its placement and access from the driver's side of the vehicle.

28. Upon locating the firearm, Officer Cuccaro immediately ceased the search pending the application for a search warrant to conduct a complete evidentiary search of the vehicle.

29. A criminal history inquiry revealed Brandon WARD has two prior felony drug trafficking convictions from the State of Ohio.

   a. On June 1, 2017, before the Summit County (OH) Court of Common Pleas, WARD entered guilty pleas to Having Weapons While Under Disability, Ohio Revised Code Section 2923.13(A)(3), a felony of the third (3rd) degree; and Trafficking In Cocaine, Ohio Revised Code Section 2925.03(A)(C)(4), a felony of the fifth (5th) degree. This case is docketed at The State of Ohio v. Brandon M. Ward, CR-2016-12-4145.

   b. On June 1, 2017, before the Summit County (OH) Court of Common Pleas, WARD entered a guilty plea to Trafficking in Marijuana, Ohio Revised Code Section 2925.03(A)(C)(3), a felony of the fourth (4th) degree. This case is docketed at The State of Ohio v. Brandon M. Ward, CR-2016-07-2264.

30. Further investigation revealed WARD is currently serving federal supervised release for a conviction of Possession of Firearm/Ammunition by a Convicted Felon, a violation of Title, 18, U.S.C. § 922(g)(1).

31. Officer Cuccaro conducted a firearm licensing inquiry and determined WARD does not possess a valid Pennsylvania License to Carry Firearms (LTCF) or recognized reciprocal concealed carry authority.

32.     Through training and experience, Officer Cuccaro knows individuals who unlawfully possess firearms commonly maintain additional firearms, magazines, ammunition, firearm accessories, holsters, cases, purchase documentation, ownership records, receipts, identifying indicia, and electronic evidence relating to firearms within vehicles under their control.

33.     Officer Cuccaro further knows cellular telephones are commonly utilized by individuals involved in unlawful firearm possession to store photographs and videos of firearms, communicate regarding the acquisition, transfer, sale, transportation, and possession of firearms, conduct internet searches relating to firearms, maintain contacts and communications, and store location information and other evidence relevant to firearms offenses.

34.     Based upon the firearm recovered during the initial lawful search, the concealed location of the firearm, WARD's operation and ownership of the vehicle, WARD's criminal history as a person prohibited from possessing, controlling, using, or transferring a firearm, WARD's lack of a valid firearm license, and the fact that the initial search was halted upon discovery of the firearm, Officer Cuccaro believed probable cause existed to search the vehicle for additional evidence relating to firearms offenses. Accordingly, Officer Cuccaro authored, obtained, and executed a state search warrant for the vehicle.

35.     Officer Cuccaro advised your affiant that when he initially conducted the traffic stop and encountered WARD, he was on a FaceTime call with someone on a smaller blue Apple iPhone **(TELEPHONE 1)**, which was later located on, inside of the car during the execution of the search warrant. WARD then put that phone down and got the larger blue Apple iPhone **(TELEPHONE 2)** which he brought back to Officer Cuccaro's police vehicle and WARD then obtained his insurance information from this other telephone, TELEPHONE 2. The third cell phone, described as a black Apple iPhone **(TELEPHONE 3),** was found in the front area of the

vehicle directly below where WARD placed **TELEPHONE 1** prior to getting out of the car. In other words, WARD not only had three different telephones in his possession during his interaction with Officer Cuccaro (TELEPHONES 1 through 3), but he also was actively using two of the three telephones at different times

36.    Officer Cuccaro also advised that he and his colleagues went back to the Red Roof Inn and obtained the hotel's Check In sheet. Det. Cpl. Matt White reviewed hotel surveillance camera video. The video showed that the passenger Winner Clayton Fields checked in at approximately 9:30am and the room was rented until June 1, 2026. WARD and the female were both observed on video entering the hotel room at approximately 9:40 am and exiting the room at approximately 11:00 am. Neither were observed going into the back seat of the vehicle.

37.    I know through training and experience, as well as consulting with SA Robert McGlennon, who is an ATF interstate nexus expert, that Sig Sauer does not manufacture firearms in the Commonwealth of Pennsylvania, and therefore the firearm traveled in and affect interstate commerce prior to its recovery.

38.    Accordingly, I submit that there is probable cause to believe that TARGET TELEPHONES 1 THROUGH 3, will contain evidence of the TARGET OFFENSE.

### EVIDENCE LIKELY TO BE FOUND AT SEARCH LOCATIONS

39.    Based on my training and experience, I am aware that targets of firearms and narcotics trafficking investigations utilize cellular telephones and electronic devices to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. I am also aware that these targets also utilize multiple cellular telephones and electronic devices at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone and/or

electronic device, their co-conspirators to another phone and/or electronic device, and their drug source of supply to yet another phone and/or electronic device.

40.    I am also aware that people in general, and those involved in firearms and/or drug trafficking (either as a distributor or customer) in particular, keep their cellular telephones on their persons or in close reach. For drug traffickers and firearms traffickers alike, the cellular phone has become a tool to facilitate criminal activity; specifically, the phone is used to arrange meetings with customers, to speak with fellow co-conspirators, and to coordinate with sources of supply.

41.    I am aware through my training and experience obtaining and utilizing cellphone records in criminal investigations, that individuals frequently call and/or text regarding involvement in criminal activity during and/or after a criminal action has occurred. I would note that more often than ever, cellular telephones and their daily use are more ubiquitous than ever. A high percentage of the population regularly uses and carries a cellular device – for instance, most commonly a cellular telephone – with them daily and during their everyday activities. The Supreme Court has recognized the same in its decisions concerning modern cellphones. *See, e.g.*, *Carpenter v. United States*, 585 U.S. 296, 315 (2018) ("[C]ell phones and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society.") (internal quotation marks omitted); *Riley v. California*, 573 U.S. 373, 385 (2014) ("[M]odern cell phones[ . . .] which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. A smart phone of the sort taken from Riley was unheard of ten years ago; a significant majority of American adults now own such phones."); *Commonwealth of Pennsylvania v. Rushing*, 71 A.3d 939, 955 (Pa. Super. 2013) ("The cell phone has become a ubiquitous part of the American citizen's life."), *reversed on other grounds*, 99 A.3d 416 (Pa. 2014); *Commonwealth*

10

*of Massachusetts v. Almonor*, 482 Mass. 35, 45, 120 N.E.3d 1183, 1194 (Mass. 2019) ("[C]ell phones are an indispensable part of daily life and exist as almost permanent attachments to their users' bodies.") (internal quotation marks and bracketing omitted). The term mobile cellular device, or colloquy cellphones, are also generally a misnomer: cellphones are much more – rolodexes, date books/calendars, correspondence devices, social media tools, banking devices, televisions, maps, newspapers, and more. *See Riley*, 573 U.S. at 393 ("The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."); *Carpenter*, 585 U.S. at 387 (Gorsuch, J. dissenting) ("Today we use the Internet to do most everything. Smartphones make it easy to keep a calendar, correspond with friends, make calls, conduct banking, and even watch the game."). Cellphones and mobile devices accessing the Internet are so ubiquitous and commonplace with daily life that they are now routinely carried by an overwhelming majority of society to conduct and engage in daily life and their affairs.

42.    Based upon my training and experience, I am aware that it is generally common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones and electronic devices. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug

traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

43.    Members of Drug Trafficking Organizations (DTO's) often take group photographs with other enterprise members posing with paraphernalia, money, firearms and/or drugs. Many cellular telephones have a camera feature that is readily capable of capturing and storing these group photos.

44.    Members of DTO's often store each other's phone numbers and contact information in the directories of their cellular phones and/or electronic devices.

45.    Based on my experience and familiarity with cellular telephones, I am aware that cellular phones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

46.     Members of DTO's routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to law enforcement. The physical phone may no longer be an active communicative device; however, many times, these old phones are not discarded as they possess value to the DTO. The replaced device contains within it the contact information for drug customers of the DTO, and many times, these phones are maintained as digital phone books should the new active phone become unusable or unavailable. Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information should it become necessary. As stated above, members of DTOs routinely take photographs and/or memorialize other information of evidentiary value within these replaced phones. As such, it is common to recover a multitude of otherwise inactive phones, especially at locations central to or important to the DTO. Furthermore, based upon training and experience, your Affiant knows that law enforcement may recover hidden or deleted data in cellular phones, even after a lengthy period of inactivity.

47.     I am further aware that firearms are "tools of the trade" for drug traffickers, as drug traffickers often rely on firearms to protect themselves, their drug stash, and their narcotics proceeds, from robbery and/or theft, as drug traffickers are often reluctant to contact law enforcement in the event they are the victim of any such crimes, and as such are often the targets of such crimes.

48.     Based on my training and experience, I am aware that individuals such as WARD, who cannot legally purchase firearms often have to either illegally purchase them "on the street," or contact third parties and request the third parties to purchase firearms for them (referred to as a "straw purchase").  I am aware that, in order to arrange/conduct either of these transactions,

13

individuals often communicate via cellular phone with the firearms trafficker and/or straw purchaser. In so doing, individuals often exchange photographs of firearms they have for sale, or internet links and/or photographs of firearms that they want to purchase.

49. I am similarly aware that individuals such as WARD will often conduct internet searches regarding firearms, to include firearms for sale in the area, to research and/or learn more about different types of firearms, and often to research the specific firearms in their possession.

50. As set forth above, this affidavit also seeks authorization to extract data from TARGET TELEPHONES 1 THROUGH 3 to search that data for evidence of the TARGET OFFENSE.

51. Based on my training and experience, and the information known to me, I believe that the following types of evidence will likely be found on TARGET TELEPHONES 1 THROUGH 3:

- Incoming and outgoing call, text and other chat application message logs;

- Contact lists;

- Calendars;

- Photo and video galleries and related metadata;

- Sent and received text, video and audio messages/files;

- Records related to online searches and sites viewed via the internet;

- Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;

- Online or electronic communications sent and received, including email, chat, and instant messages;

- Records of FaceTime communications;

14

- Records related to location of the cellular telephone;

- Notes; and

- Voice messages.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

52.    As described above, this Application seeks permission to search TARGET TELEPHONES 1 THROUGH 3 for evidence of violations of the TARGET OFFENSES.

53.    Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been sent/received, accessed, captured, downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files including photos or videos of firearms, downloaded to a storage medium can be stored for years at little or no cost. Similarly, chat communications can be stored locally on the device and are also able to be backed up to remote servers.  Users can generally use these remote backups to recover deleted or lost communications.

54.    Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

55.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

56.    Wholly apart from user-generated files, electronic device storage media—in particular, electronic devices' internal storage—contain electronic evidence of how an electronic

device has been used, what it has been used for, where it was located, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

57.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

58.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the cellular telephone consistent with the warrant. The examination requires technicians to extract data from the cellular telephone using forensic software. That data will then be searched for the evidence described above.

59.     As the cellular telephone will be in law enforcement custody, I ask permission for law enforcement to search these devices at any time day or night.

**CONCLUSION**

60.     Based on the facts above, I submit that there is probable cause to believe that evidence of the TARGET OFFENSE will be located in TARGET TELEPHONES 1 THROUGH 3.

*/s/ Ryan P. O'Sullivan*
Ryan P. O'Sullivan, Special Agent
Bureau of Alcohol, Tobacco,
Firearms, And Explosives

Sworn to and subscribed to before me,
by telephone Pursuant to Fed. R. Crim. P.
4.1(b)(2)(A), this 22nd day of June 2026.


_____
HONORABLE PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

TARGET TELEPHONE 1: a smaller blue Apple iPhone seized from Brandon WARD on or about May 31, 2026, and currently in the custody of the Pittsburgh Bureau of Police (PBP) Computer Crimes Unit.

## ATTACHMENT A-2

TARGET TELEPHONE 2: a larger blue Apple iPhone seized from Brandon WARD on or about May 31, 2026, and currently in the custody of the Pittsburgh Bureau of Police (PBP) Computer Crimes Unit.

**ATTACHMENT A-3**

TARGET TELEPHONE 3: a black Apple iPhone seized from Brandon WARD on or about May 31, 2026, and currently in the custody of the Pittsburgh Bureau of Police (PBP) Computer Crimes Unit.

**ATTACHMENT B**

***Items to be Searched for and Seized from Cellular Telephones***

Any and all evidence, instrumentalities, fruits, and contraband relating to violations of Title 18, U.S.C. § 922(g)(1), to include:

1. Incoming and outgoing call, text and other chat application message logs;

2. Contact lists;

3. Calendars;

4. Photo and video galleries;

5. Sent and received text, video and audio messages/files;

6. Records related to online searches and sites viewed via the internet;

7. Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;

8. Online or electronic communications sent and received, including email, chat, and instant messages;

9. Records of facetime communications;

10. Records related to location of the cellular telephone;

11. Notes; and

12. Voice messages.